**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**JEROME CANADY, M.D.,
ARGON ELECTRO-SURGICAL CORP.,
and CANADY TECHNOLOGY, LLC**
       **Plaintiffs,**

**v.**                                  **Civil Action No. 2:05cv325**

**CONMED CORPORATION,**
       **Defendant.**


**<u>ORDER AND OPINION</u>**

Currently before the court are three motions pertaining to the declaratory judgment action

brought by plaintiffs Jerome Canady, Argon Electro-Surgical Corporation, and Canady

Technology, against defendant ConMed Corporation.  The pending motions are defendant's

Motion to Dismiss for Lack of Subject Matter Jurisdiction and plaintiffs' Motion for an Order

Enjoining Arbitration and Motion for Leave to File a Supplemented Complaint.  After

examination of the parties' detailed and well argued memoranda, the court determines that oral

argument is unnecessary because the facts and legal arguments are adequately presented, and the

decisional process would not be significantly aided by oral argument.  The court, for the reasons

set out herein, **GRANTS** defendant's Motion to Dismiss, **DENIES** plaintiffs' Motion to

Enjoin Arbitration, and declares **MOOT** plaintiffs' Motion to Supplement their complaint.


**I. Procedural History**

On June 2, 2005, the plaintiffs, Jerome Canady, M.D. ("Dr. Canady"), Argon Electro-

Surgical Corporation ("Argon Corp."), and Canady Technology, filed a two-count complaint

seeking a declaratory judgment against defendant ConMed Corporation ("ConMed").  In Count

One of the complaint, plaintiffs seek a declaratory judgment establishing that plaintiffs' proposed sales of "dual-mode" medical catheters will not violate a licensing agreement previously entered into between Dr. Canady, Argon Corp., and ConMed.  In Count Two, plaintiffs seek a declaration that the sale of both "single-mode" and "dual-mode" catheters will not violate a patent held by ConMed.

On June 22, 2005, defendant filed a motion to dismiss plaintiffs' declaratory judgment action pursuant to the licensing agreement the parties had previously entered into and Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Plaintiffs responded on July 5, 2005, by filing a motion for an order enjoining arbitration as well as a memorandum in support of such motion and in opposition of defendant's motion to dismiss.  Defendant filed a reply brief to plaintiffs' opposition on July 8, 2005.  Subsequently, on September 9, 2005, plaintiffs filed a memorandum and motion for leave to file an amended and supplemented complaint.  The defendant filed a timely memorandum in response and the plaintiffs filed a timely reply.

## II. Factual Background

### A. The Canady and McGreevy Patents

Dr. Jerome Canady is the inventor of the "Canady Catheter," a medical instrument used to coagulate or vaporize tissue during endoscopic surgery.  Compl. ¶ 8.  The Canady Catheter comes in two forms, single-mode, which is used only to coagulate or vaporize tissue, and dual-mode, which coagulates and vaporizes tissue but also has an additional feature such as biopsy forceps or a dissection needle.[1]  Id. ¶ 9.  In 1993, Dr. Canady obtained a patent for the Canady

---

[1] The catheters are also referred to as "probes."

Catheter and the patent is currently owned by Dr. Canady and Argon Corp.  Id. ¶ 10-11.

In order for the Canady Catheter to function it must be connected to a device called an Argon Plasma Generator, which as the name suggests, generates a stream of argon gas that passes through the catheter, enabling tissue coagulation or vaporization.  Id. ¶ 12.  ConMed currently owns a patent ("the McGreevy patent") on an Argon Plasma Generator that has previously been used for medical applications other than in conjunction with the Canady Catheter.  Id. ¶ 12.  The McGreevy patent expires in April, 2006.  Id. ¶ 13.

### B. The Canady-ConMed Contract

Dr. Canady and Argon Corp. entered into an exclusive licensing agreement (the "Contract") with ConMed on August 3, 2001.[2]  The Contract provided ConMed an exclusive license to import, use, sell, and distribute dual-mode Canady Catheters.  Contract ¶ 2(a); Compl. ¶ 16.  Furthermore, ConMed obtained a perpetual but non-exclusive license to import, make, have made, use and sell, single-mode Canady Catheters.[3]  Contract ¶ 2(b); Compl. ¶ 15.  Pursuant to the Contract, Dr. Canady and Argon Corp. would receive royalties for ConMed's sales of the dual-mode probes, but not for sales of the single-mode probes.  Contract ¶ 4; Compl. ¶¶ 15-16.

In accordance with the terms of the licensing agreement, Dr. Canady and Argon Corp. had the right to terminate the Contract upon sixty days notice if "for other than health and safety

---

[2] Canady Technology, the third plaintiff, was not a party to the Contract entered into on August 3, 2001.  Rather, subsequent to the purported termination of the August 3, 2001 Contract, Dr. Canady and Argon Corp. entered into two new agreements with Canady Technology.  The new agreements essentially granted Canady Technology the same rights that the August 3, 2001 Contract had provided to ConMed.  Compl. ¶¶ 14-16, 26.

[3] The Contract provided ConMed with non-terminable rights to a single-mode catheter called the "ABC Flex GI Probe."  However, ConMed is prohibited from modifying the probe, including adding a handle or any other portion made to be gripped by the hand.  Contract ¶ 2(b).

reasons, [ConMed] abandons the development, production or sale of the Product."[4]   Contract ¶ 11.  The Contract further established that ConMed would be deemed to have abandoned the Product if : (1) ConMed failed to seek FDA approval within twelve months; (2) ConMed made no commercial sales within six months after FDA approval; (3) ConMed instructed its sales force to discontinue sales or marketing of the Product for a period of twelve months; or (4) ConMed failed to offer the Product for sale through its normal channels within six months of being able to do so.  Id.

In a letter dated October 21, 2004, Dr. Canady and Argon Corp. placed ConMed on notice that they planned to terminate the Contract pursuant to the abandonment clause cited above.  Compl. Exhibit B.  ConMed responded via letter dated December 14, 2004, stating that ConMed was still "very much committed to the Product" and that the "purported grounds for termination . . . are mistaken."  Jonas Decl. Exhibit F.  ConMed claimed that it had not abandoned the development, production, or sales of probes and that any delay that had occurred was "a function of health and safety reasons within the meaning of the Licensing Agreement." Id.  On December 30, 2004, after more than sixty days had elapsed from the date they provided notice, Dr. Canady and Argon Corp. sent a follow up letter purporting to terminate the contract effective December 30, 2004.  Compl. Exhibit C.

### C. The Arbitration Clause

The August 3, 2001 Contract between Dr. Canady, Argon Corp., and ConMed, contains

---

[4] Although the Contract defines the word "Product" as all forms of probes within the Canady Patent, including single-mode ABC Flex GI Probes, as indicated in footnote 3, ConMed's non-exclusive license to sell unmodified, single-mode ABC Flex GI Probes was perpetual and specifically excluded from the termination provision cited above.

an arbitration clause which forms the basis for: (1) Count I of plaintiffs' declaratory judgment action; (2) defendant's motion to dismiss Count I; and (3) plaintiffs' motion to enjoin arbitration. The arbitration provision in the Contract provides as follows:

> Any controversy or claim arising out of, or relating to this Agreement, or its breach, will be settled by arbitration . . . .  Before any arbitration proceedings may be commenced, however, the parties will meet in person at least two times within sixty (60) days in New York City to discuss in good faith a resolution to such controversy or claim.

Contract ¶ 15(a) (emphasis added).  Plaintiffs allege that the two meetings referred to in the arbitration clause did not occur, and therefore, this court, and not an arbitrator, has jurisdiction to entertain the instant dispute.  Defendant contends first, that the meetings were properly held and second, that even if it is unclear as to whether the meetings were properly held, such dispute must be addressed through arbitration, not through a lawsuit filed in this court.

### III. Standard of Review

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1) for lack of subject matter jurisdiction may attack the complaint on its face or attack underlying jurisdictional claims contained in the complaint.  Lane v. David P. Jacobson & Co., 880 F. Supp. 1091, 1094 (E.D. Va. 1995).  The burden of establishing jurisdiction lies with the plaintiff, and when determining jurisdiction, the trial court may consider facts outside of the pleadings without converting the motion into one for summary judgment.  Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).  Likewise, in weighing the evidence the court may resolve factual questions to determine its jurisdiction.  Id.

Here, defendant raises different jurisdictional arguments relating to Count I and Count II of plaintiffs' complaint, however, both challenge the underlying jurisdictional elements.  With

respect to Count I, defendant argues that this court has no jurisdiction because the arbitration

clause in the August 3, 2001 Contract requires that the dispute be settled through arbitration.

With respect to Count II, the defendant argues that the plaintiffs did not have a "reasonable

apprehension" that the defendant would file a patent infringement suit and, therefore, did not

meet the jurisdictional requirements for bringing a declaratory action in a patent case.

## IV. Analysis

### <u>Count I</u>

Plaintiffs' first count of their complaint seeks a declaratory judgment that plaintiffs'

anticipated sales of dual-mode probes within the United States would not violate the August 3,

2005 Contract entered into between Dr. Canady, Argon Corp., and ConMed.  ConMed, in its

motion to dismiss, argues that this court does not have jurisdiction to consider plaintiffs' Count I

claim because the dispute falls within the Contract's arbitration clause; therefore, it must be

decided by an arbitrator.  As a result, the deceptively complex question before the court with

regard to Count I is whether the instant dispute falls within the scope of the arbitration clause and

if so, whether the court or an arbitrator should decide if procedural prerequisites to arbitration

have been complied with.[5]  See <u>Local Union No. 637, Int'l Bhd. of Elec. Workers, AFL-CIO v.

Davis H. Elliot Co.</u>, 13 F.3d 129, 132 (4th Cir. 1993).

The determination as to whether a particular dispute falls within the scope of an

---

[5] Defendant's motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1) argues for dismissal of both Count I and Count II of plaintiffs' declaratory judgment action.  Plaintiffs' motion to enjoin arbitration relates only to Count I.  Because defendant's motion is granted with respect to Count I as a result of the contractual requirement that the parties arbitrate the dispute, plaintiffs' motion to enjoin arbitration is denied.

arbitration clause is a question for the court.  Local Union No. 637, Int'l Bhd. of Elec. Workers, AFL-CIO v. Davis H. Elliot Co., 13 F.3d 129, 132 (4th Cir. 1993) ("Since the question of whether the parties have agreed to submit a case to arbitration is one of contract interpretation, resolution of the question is a judicial matter for the court."); AT&T Techs., Inc. v. Commc'n Workers of America, 475 U.S. 643, 648 (1986) ("It is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances . . . .").  When making such determination, a district court must carefully examine the contract because "the right to compel arbitration is contractual and consensual . . . 'and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"  Local Union No. 637, Int'l Bhd. of Elec. Workers, AFL-CIO v. Davis H. Elliot Co., 13 F.3d 129, 132 (4th Cir. 1993) (quoting AT&T Techs., Inc. v. Commc'n Workers of America, 475 U.S. 643, 648 (1986)); see also Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 374 (1974).  Likewise, although federal precedent generally recognizes a presumption favoring arbitration, notwithstanding such presumption, an arbitration clause should be interpreted based on the "traditional and familiar rules of contract interpretation."  Hendrick v. Brown & Root, Inc., 50 F. Supp. 2d 527, 532 (E.D. Va 1999); see Washington Square Securities, Inc. v. Aune, 385 F.3d 432, 436 (4th Cir. 2004) (stating that although the presumption applies to "ambiguities as to the scope of the arbitration clause," that "the examination of the scope of an arbitration agreement is primarily a task of contract interpretation.  As with any other contract, the parties' intentions control.") (citations omitted); Rogers v. Comcast Corp., 341 F. Supp. 2d 42, 46 (D. Mass. 2004) ("The federal policy in favor of arbitration does not mean that this Court should stretch to find ambiguity where there is none.").

7

The court, in reviewing the contract language in conjunction with consideration of traditional interpretation rules, must determine if the parties have agreed to submit the subject matter of the dispute to arbitration.  Local Union No. 637, 13 F.3d at 131; see also Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84 (2002).  If the court determines "that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." Local Union No. 637, 13 F.3d at 131 (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547 (1964)); see Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002) ("'[P]rocedural' questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide.") (citations omitted).  The Fourth Circuit Court of Appeals has clarified the interplay between the court's role and the arbitrator's role stating: "Thus, the scope of an arbitration clause defining the arbitrator's jurisdiction is a question for the court, but a subsequent defense to a particular dispute committed to the arbitrator, even if the defense defeats the right to arbitrate, is within the jurisdiction of the arbitrator."  Local Union No. 637, 13 F.3d at 132 (emphasis added).

Contrary to the precedent explained above, plaintiffs ask this court to conclude that the two meetings contemplated by the arbitration clause were not conducted, and that as a result of the parties' failure to hold the meetings, no jurisdiction exists for an arbitrator to decide anything, including the procedural question of whether or not the meetings were held.  Plaintiffs point out that, as stated by the Supreme Court in Howsam, the question of whether procedural prerequisites were satisfied is only "presumptively" a question for the arbitrator.  Howsam, 537 U.S. at 84; Pl. Opp. p.12.   Furthermore, relying on Fifth Circuit precedent, plaintiffs argue that

this court should recognize an exception that applies when a procedural dispute acts as an absolute bar to arbitration.  See General Warehousemen and Helpers Union Local 767 v. Albertson's Distribution, Inc., 331 F.3d 485, 488 (5th Cir. 2003).  Such exception would require a court, and not an arbitrator, to decide if dispositive procedural prerequisites were complied with.  Id.

Although plaintiffs correctly submit that the Supreme Court's opinion in Howsam established that procedural questions are only "presumptively" for an arbitrator, the Fourth Circuit, unlike the Fifth Circuit, has yet to recognize an exception establishing when a court should decide procedural issues.  Furthermore, Fourth Circuit precedent appears in conflict with Fifth Circuit caselaw, as the Fourth Circuit has held that even a defense that defeats the right to arbitrate "is within the jurisdiction of the arbitrator."  Local Union No. 637, 13 F.3d at 132. However, even if this court did not construe Fourth and Fifth Circuit precedent as conflicting, following the Supreme Court's analysis in Howsam, the instant facts read in conjunction with the arbitration clause do not present a scenario where the "presumption" should be overcome.  As stated in Howsam, the "questions of arbitrability" which are placed in the jurisdiction of the court, have a "limited scope" and are "applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter." Howsam, 537 U.S. at 83.  The Court further explained that recognizing jurisdiction in a federal court in such situations "avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate."  Id. at 83-84.

Here, there is no indication from the text of the arbitration clause that the parties did not agree to arbitrate the instant matter.  Nor is there any indication that the parties intended that a

court decide procedural matters.[6]  Furthermore, common sense does not suggest that a federal

court would be the anticipated forum to solve such procedural disputes.  If one party

"prematurely" filed a demand for arbitration before settlement meetings were conducted,

common sense dictates that the other party would contact the arbitrator, and not a federal court,

to seek a delay or discontinuation of the arbitration proceedings as premature.  Therefore, both

the text of the Contract and common sense indicate that even if this court favored recognizing an

exception to the general presumption that an arbitrator decide procedural matters, the

presumption could not be overcome in this matter.

  Next, addressing the Fifth Circuit precedent cited by plaintiffs, an examination of the

holding in General Warehousemen reveals that the Fifth Circuit found that the exception to the

rule that arbitrators decide procedural matters is a "rare exception."  331 F.3d at 488.[7]  The

--------

  [6] The Contract states: "Any controversy or claim arising out of, or relating to this
Agreement, or its breach, will be settled by arbitration . . . .  Before any arbitration proceedings
may be commenced, however, the parties will meet in person at least two times within sixty (60)
days in New York City to discuss in good faith a resolution to such controversy or claim."
Contract ¶ 15(a) (emphasis added).  In Local Union No. 637, the Fourth Circuit distinguished the
arbitration clause in issue from the "broad arbitration clauses construed in Wiley and AT&T,
which assigned to arbitration all disputes relating to the agreement or its interpretation."  13 F.3d
at 132.  The arbitration clause in the instant matter, assigning to arbitration all controversies that
arise out of or even merely relate to the Contract is likewise a broad provision that shows no
intention of limiting the scope of disputes that fall within it.

  [7] Both the Fifth Circuit in General Warehousemen and the plaintiffs in the present matter
also cite to John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557-58 (1964), as support for
recognizing a "rare exception."  However, a closer reading of John Wiley reveals that the Supreme
Court applied the same rule that this court applies today, and rather than carving out an
exception, merely mentioned the exception in dicta.  The court stated:
> Once it is determined, as we have, that the parties are obligated to submit the subject
> matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute
> and bear on its final disposition should be left to the arbitrator.  Even under a contrary
> rule, a court could deny arbitration only if it could confidently be said not only that a
> claim was strictly 'procedural,' and therefore within the purview of the court, but also
> that it should operate to bar arbitration altogether, and not merely limit or qualify an

appeals court explained that the "rare exception" will be applied only if "'<u>no rational mind</u>' could question that the parties intended for a procedural provision to preclude arbitration and that the breach of the procedural requirement was clear." <u>Id.</u> (emphasis added) (citations omitted). Thus, even if this court applied the standard set forth in <u>General Warehousemen</u>, the matter before the court does not qualify as a "rare exception" because "rational minds" could differ as to whether the breach was clear, as the parties met in person several times in an attempt to settle the instant dispute.[8]

In ruling on the dispute relating to Count I and the arbitration clause, this court will not apply the standard set forth in <u>General Warehousemen</u> because Fourth Circuit precedent fully addresses the proper analysis for this court to undertake. The Fourth Circuit has unambiguously held that if the subject matter of a dispute is within the arbitration clause than an arbitrator has

---

arbitral award.
<u>Id.</u> (emphasis added).

[8] There is both a factual dispute as to which discussions between the parties qualify as a "meeting" and a dispute over the whether the Contract text "within sixty (60) days" should be interpreted to mean that the meetings must occur within sixty days of each other or within sixty days of the alleged contract termination. Plaintiffs interpret the sixty-day time period in the arbitration clause as a form of limitations period, claiming that the sixty-day time limit "is obviously to require the parties to settle their dispute in a limited time period," Pl. Opp. p.15. Defendant argues that the two meetings must merely be completed within sixty days of each other, and that such interpretation is consistent with both the contract language stating that the arbitration provision survives termination of the contract and with the arbitration clause's express declaration that the meetings are to "discuss in good faith a resolution to such controversy or claim." Defendant contends that the explanation of the purpose of the meeting requirement indicates that the goal is to avoid unnecessary arbitration for claims that can be amicably settled, not to impose a new limitations period.

Both parties appear to present rational interpretations of the contract language as well as rational factual arguments. However, as procedural prerequisites are to be analyzed by an arbitrator, it is not this court's place to weigh the potential for success of each of the parties' arguments. Rather, the court merely notes the parties' arguments in order to highlight that rational minds could clearly differ as to the proper result.

jurisdiction to decide procedural questions, "even if the defense defeats the right to arbitrate." Local Union No. 637, 13 F.3d at 132.  Likewise, in Local Union No. 637, the Fourth Circuit based its holding on the distinction between "substantive contract conditions" and "procedural conditions to the arbitration."  Id. at 134; see Tobacco Workers Int'l Union, Local 317 v. Lorrillard Corp., 448 F.2d 949, 953-54 (4th Cir. 1971) (finding that even when procedural disputes are distinct from questions related to the merits, an arbitrator should decide procedural matters); Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) ("[T]he presumption is that the arbitrator should decide 'allegations of waiver, delay, or a like defense to arbitrability.'") (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).

Applying the rule as laid out above, this court must look to the language of the arbitration clause to determine if the subject matter of the dispute is within the arbitration clause.  Local Union No. 637, 13 F.3d at 131-32; John Wiley, 376 U.S. at 557.  If it is, all procedural questions are within the jurisdiction of the arbitrator.  Local Union No. 637, 13 F.3d at 132.  Here, the arbitration clause is very broad stating: "Any controversy or claim arising out of, or relating to this agreement, or its breach, will be settled by arbitration." Contract § 15(a) (emphasis added). The above clause, similar to the clauses in Wiley and AT&T, clearly intends to broadly confer jurisdiction on an arbitrator because it not only encompasses claims "arising out of" the contract but also claims merely "relating" to the contract.  The dispute over ConMed's alleged failure to market and sell Canady Catheters as required by the Contract plainly "arises out of" the Contract, the very document that grants ConMed the legal right to market and sell such products. However, even if this court held otherwise, no rational argument can be advanced to establish that the parties' legal rights and obligations that were created as a result of a contract that they

voluntarily entered into are not at least "related" to that contract.

Furthermore, the procedural dispute in issue is whether two pre-arbitration meetings occurred and occurred in a timely manner.  This is precisely the type of "waiver, delay, or a like defense to arbitrability" that should be settled by an arbitrator.  Howsam, 537 U.S. at 83; see Tobacco Workers Int'l Union, Local 317 v. Lorrillard Corp., 448 F.2d 949, 953 ("We think the District Court was clearly correct in deciding that the question of whether the grievances were timely filed was for the arbitrator.").  Following Supreme Court and Fourth Circuit precedent, because the subject matter of the parties' dispute falls squarely within the arbitration clause and the language of the contract does not show an expectation that the court decide procedural issues, all procedural matters, even those that may defeat the right to arbitrate, are properly addressed by an arbitrator.  Local Union No. 637, 13 F.3d at 131.  Therefore, defendant's motion to dismiss Count I is granted, and plaintiffs' motion to enjoin arbitration is denied.

## Count II

The second count of plaintiffs' complaint seeks a declaratory judgment that plaintiffs' anticipated sales of both single and dual-mode probes would not violate the McGreevy patent on Argon Plasma Generators, a patent currently owned by ConMed.[9]  ConMed, in its motion to dismiss, argues that the court does not have jurisdiction to consider plaintiffs' Count II claim

_____

[9] The McGreevy patent dispute, although related to Count I, is not governed by the Canady-ConMed Contract or its arbitration clause.  Thus, this court has jurisdiction to consider plaintiffs' request for a declaratory judgment relating to the McGreevy patent.  Furthermore, because the Contract only granted ConMed a non-exclusive license to sell single-mode probes, Dr. Canady and Argon Corp. appear to have retained the right to grant additional non-exclusive licenses without violating the Contract with ConMed.  Therefore, Count II would not necessarily be rendered moot by a favorable arbitration result for ConMed and is properly addressed by the court at this time.

because, under Federal Circuit precedent, the plaintiffs have failed to establish the jurisdictional

prerequisites for a declaratory judgment action filed in anticipation of a patent infringement

suit.[10]  Furthermore, even if the jurisdictional prerequisites are established, ConMed asks this

court to utilize its discretion to decline to exercise declaratory judgment jurisdiction.  See Elecs.

for Imaging, Inc. v. Coyle, 394 F.3d 1341, 1345 (Fed. Cir. 2005).  It should be noted, however,

that if jurisdiction is deemed to be proper, the court, in consideration of the purposes of the

Declaratory Judgment Act, must have "well-founded reasons" for declining to exercise

jurisdiction.  Capo, Inc. v. Dioptics Med. Prods., 387 F.3d 1352, 1355 (Fed. Cir. 2004).

In determining whether plaintiffs have established the jurisdictional prerequisites to filing

a declaratory judgment patent action, the court must apply a two-part test established by the

Federal Circuit.  See, e.g., Goodyear Tire & Rubber Co. v. Releaseomers Inc., 824 F.2d 953, 955

(Fed. Cir. 1987); Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed. Cir.

1988).  The test requires plaintiffs to establish: (1) when plaintiffs filed their complaint they had

an objectively "reasonable apprehension" that ConMed would file a patent infringement suit; and

(2) when plaintiffs filed their complaint they had produced or made "meaningful preparations" to

produce the allegedly infringing devices for sale.  Goodyear, 824 F.2d at 955; Arrowhead, 846

F.2d at 736.  After applying this test, the court should also consider whether exercising

jurisdiction would promote the purposes of the Declaratory Judgment Act, including the goal of

---

[10] Declaratory judgment patent cases are governed by Federal Circuit precedent.
Electronics for Imaging, Inc. v. Coyle, 394 F.3d 1341, 1345-46 (Fed. Cir. 2005) ("The question
whether to accept or decline jurisdiction in an action for a declaration of patent rights in view of
a later-filed suit for patent infringement impacts this court's mandate to promote national
uniformity in patent practice.  Because it is an issue that falls within our exclusive subject matter
jurisdiction, we do not defer to the procedural rules of the regional circuits nor are we bound by
their decisions.").

"provid[ing] the allegedly infringing party relief from uncertainty and delay regarding its legal rights."  Elecs. for Imaging, 394 F.3d at 1346 (quoting Goodyear, 824 F.2d at 956).

### A.  Element One: Objectively reasonable apprehension

As stated above, the first prong of the test set forth in Goodyear and Arrowhead requires the plaintiffs to establish that they had an objectively reasonable apprehension that defendant would file a patent infringement suit.  Arrowhead, 846 F.2d at 736.  The apprehension must have existed at the time the complaint was filed, and post complaint events should not be considered by this court.  West Interactive Corp. v. First Data Resources, Inc., 972 F.2d 1295, 1297 (Fed. Cir.1992); see Spectronics Corp. v. H.B. Fuller, Co., 940 F.2d 631, 634-35 (Fed. Cir. 1991) ("We agree wholeheartedly that . . . later events may not create jurisdiction where none existed at the time of filing."), abrogated on other grounds by Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 95 (1993); CAE Screenplates, Inc. v. Beloit Corp., 957 F. Supp. 784, 789-90 (E.D. Va. 1997) (holding that all events unknown to the plaintiff, no matter when they occurred, should not be considered as part of the jurisdictional calculus); Performance Abatement Servs., Inc. v. GPAC, Inc., 733 F. Supp. 1015, 1019 (W.D.N.C. 1990) (stating that plaintiff "cannot justify its claimed apprehension on [defendant's] institution of a patent infringement suit two weeks after [plaintiff] filed its action").  Furthermore, the Federal Circuit has recently clarified that a party must be in apprehension of an "imminent suit," and that the "requirement of imminence reflects the Article III mandate that the injury in fact be 'concrete,' and 'actual or imminent, not conjectural or hypothetical.'" Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc., 395 F.3d 1324, 1333 (Fed. Cir. 2005) (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101, 103 (1998)).

Reasonable apprehension that existed at the time the complaint was filed can be established through a direct charge of infringement or a "totality of the circumstances" test. Arrowhead, 846 F.2d at 736.  The Federal Circuit has held that if a defendant "has expressly charged a current activity of the plaintiff as an infringement, there is clearly an actual controversy, certainty has rendered apprehension irrelevant, and one need say no more." Id. (emphasis added).  On the other hand, if there is no direct charge, a court must consider the totality of the circumstances "[i]n light of the subtleties in lawyer language" in order to prevent avoidance of declaratory judgment jurisdiction based on careful word choice.  Id.; see EMC Corp. v. Norand Corp., 89 F.3d 807, 811-12 (Fed. Cir. 1996) (stating that the test is a pragmatic one which "cannot turn on whether the parties use polite terms").  However, such test should also be applied in light of the "imminence" requirement clarified in Teva Pharmaceuticals, 395 F.3d at 1333, and therefore, the parties relationship and the context in which the statements were made are crucial to the inquiry.

Applying the test set out in Goodyear and Arrowhead, federal courts have consistently held that statements made during licensing negotiations should not be considered by the court in its determination of whether a party had an objectively reasonable apprehension of imminent litigation.  See, e.g., Capo, Inc. v. Dioptics Medical Products, Inc., 387 F.3d 1352, 1356 (Fed. Cir. 2004) (highlighting the difference between threats "not aimed at negotiation, but at impeding a competitor's commercial activity" and "'jawboning' and aggressive negotiation"); EMC Corp. v. Norand Corp., 89 F.3d 807, 811-12 (Fed. Cir. 1996) (recognizing that "any time parties are in negotiation over patent rights, the possibility of a lawsuit looms in the background" and therefore the court's ruling should turn on the substance of the parties' relationship, not whether they used

16

polite terms or engaged in "bellicose saber rattling"); CAE Screenplates, Inc. v. Beloit Corp., 957

F. Supp. 784, 791 (E.D. Va. 1997) ("[I]t is well-settled that positions adopted by a declaratory

judgment defendant during on-going licensing negotiations cannot be used to support plaintiff's

objective, reasonable apprehension.").  In Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 889 (Fed.

Cir. 1992), a case factually similar to the present matter, the Federal Circuit held that the plaintiff

did not have a "reasonable apprehension" of litigation even though the defendant had expressly

stated that it would enforce its patent.  The court explained:

> We must look at these events in the context in which the discussions arose. Amoco
> took no action against Shell; it made no assertive contact concerning the patent; it
> issued no threats. Shell, in an exercise of prudent good business citizenship,
> approached Amoco, stating that it intended to embark on a course of conduct,
> recognizing, but disagreeing, that Amoco's patent might be considered to dominate
> its work. . . .  Amoco, on the other hand, then defended its patent. In doing so, it
> should not be considered to have threatened Shell with suit. Shell clearly stated
> that it considered the '679 patent to be invalid and not infringed. The statements by
> Amoco which Shell alleges were charges of infringement were simply Amoco's
> responses to Shell's initiatives. Amoco's use of language to indicate that Shell's
> activities "fall within," are "covered by," and are "operations under" Amoco's
> patent fall short of alleging infringement. The language closest to constituting a
> threat occurred when Shell asked if Amoco intended to enforce its patent, and
> Amoco answered "yes." However, under the circumstances, that answer was
> reflexive and obligatory. To have answered "no" would have potentially given
> Shell free reign to infringe Amoco's patent. If Amoco wanted to continue to
> negotiate a license with Shell, its response was necessary.

Id. (emphasis added).  A similar result was reached in CAE Screenplates, 957 F. Supp. at 791

("Thus, [defendant's] participation in negotiations with [plaintiff] constituted protected

commercial activity and its letters merely reflected its position relative to [plaintiff's] demands.

Under the authority of Shell Oil, therefore, none of [defendant's] statements give rise to

objective, reasonable apprehension.").

Here, a dispute arose after Dr. Canady and Argon Corp. attempted to cancel the Canady-

17

ConMed Contract.  Plaintiffs argue that ConMed's president, Joseph Corasanti, made threats to

sue plaintiffs both in a private meeting between Mr. Corasanti and Dr. Canady, and in a meeting

between ConMed and Canady representatives, at which both Canady Technology's supplier and

investor were present.[11]  Plaintiffs argue that both threats were made in an attempt to intimidate

plaintiffs into not bringing such products to market.

Considering first the private threat made by Mr. Corasanti to Dr. Canady, the statement

allegedly occurred during the course of negotiations regarding the Canady-ConMed Contract

during a meeting in April 2005, in Naples, Florida.  During the negotiations, Mr. Corasanti

allegedly stated: "ConMed would have to sue Canady Technology for patent infringement, if it

sold the probes, in order to protect ConMed's royalty stream from Erbe."[12]  Memo in Opp. at 8.

Mr. Corasanti states that he does not remember making this statement or even discussing the

McGreevy patent while negotiating with Dr. Canady in Naples.  However, even if this statement

was made, it appears that, at the time, the plaintiffs considered the Naples negotiations a success.

Subsequent to the meeting, Dr. Canady's attorney, Joel Nied, sent an email to ConMed's counsel

---

[11] Plaintiffs highlight the fact that Canady Technology's supplier and investor were
present at negotiations in order to demonstrate that ConMed's "threats" were intended to impede
plaintiffs' ability to bring their product to market, as these third parties may be fearful of
becoming involved with a potentially infringing product.  Plaintiffs' argument is unconvincing,
however, because the presence of these parties appears incidental to the statements made by
ConMed.  Furthermore, ConMed never made any threats or attacks in an attempt to alarm these
parties once their presence was known.  Rather, ConMed simply responded in a non-threatening
manner to statements made by plaintiffs.  It would be disingenuous to Federal Circuit precedent
to create the opportunity for future plaintiffs to manipulate jurisdiction by inviting a supplier,
investor, or major customer to license negotiations, making statements that are likely to
encourage a response such as the one made by ConMed, and then premising jurisdiction on the
fact that such response was made in the presence of key third parties.

[12] ConMed had licensed the McGreevy patent to Erbe Electromedizin GmbH, and Erbe
was selling a form of single-mode probes and paying substantial royalties to ConMed.  Memo in
Opp. at 8.

stating that Dr. Canady had told Mr. Nied that the parties had scheduled a meeting in New York on May 10, 2005 to "flesh out the details of the agreement they reached in Naples."  Jonas Decl. Exhibit L.  The email written by Dr. Canady's attorney further stated "It is my hope that, at the end of the meeting, we will be prepared to draft final documents memorializing the relationship." Id.  Thus, it does not appear that an objectively reasonable person would anticipate a lawsuit if they believed a resolution to the dispute had been agreed to in principle.  However, even if plaintiffs' took the somewhat dubious position that over a month later, when they filed their complaint, they thought back to this statement and feared litigation, as discussed below, this court would still find that the statement fails to establish jurisdiction when the context of the negotiations as well as the parties' relationship is considered.  The statement made by Mr. Corasanti was not an express charge of current infringement but rather made during a discussion about what could potentially occur at some point in the future.  Furthermore, the statement was not only made during the course of negotiations, but similar to statements made in Shell Oil, it was made in direct response to Dr. Canady's announcement of plaintiffs' proposed course of conduct.[13]

The other "threat" relied on by plaintiffs was also made during negotiations and again referred to potential future activities.  Furthermore, the statement does not even mention, expressly or impliedly, the potential for future litigation let alone "imminent" litigation. Plaintiffs claims that the "threat" was first verbally made during a negotiation meeting in New

---

[13] Plaintiff's Memorandum in Opposition to ConMed's Motion to Dismiss states: "When Dr. Canady met with Joseph Corasanti in Naples, Florida in April, 2005, he told him that he planned to sell single and dual mode probes manufactured by KLS Martin through Canady Technology. . . . Corasanti said that ConMed would have to sue Canday Technology for patent infringement, if it sold the probes . . . ."  Pl. Opp. p. 8.

York on May 11, 2005, at which Canady Technology's investor and supplier were present, and

then repeated by ConMed in a letter dated May 27, 2005.  The letter stated:

> You have also indicated that you plan to take steps to import and sell the
> Martine Argon Plasma Generator and Single and Dual Mode Argon Probes in
> the United States and other countries.  These are products which would plainly
> infringe on the McGreevy Patent.

Jonas Decl. Exhibit N at 1.  In addition to the rather innocuous statement above, Canady claims

that litigation was anticipated based on one additional line in the letter which stated that in

addition to arbitration ConMed would "pursue all other remedies available to it."  Id. at 4.

The statements made by ConMed, considered in context, do not constitute a direct charge

of current patent infringement putting Canady in fear of an "imminent" suit.  Likewise, they do

not appear to be threats made in order to "imped[e] a competitor's commercial activity."  Capo,

Inc. v. Dioptics Medical Products, Inc., 387 F.3d 1352, 1356 (Fed. Cir. 2004).   Rather, they were

statements made during the course of negotiations, in response to plaintiffs' proposed course of

conduct.  Under these circumstances, this court "will not encourage litigation by finding a threat

to sue only because a non-threatening party, when approached by a possible infringer, asserted its

best arguments in discussions.  [Defendant's] statements to [plaintiff], in the context in which

they arose, were not threats to sue.  They were responses, characterizations, and arguments

arising from discussions [plaintiff] initiated."  Shell Oil, 970 F.2d at 889.

Likewise, considering the statements under a totality of the circumstances test also does

not persuade this court to find that plaintiffs had an objectively reasonable apprehension of a

patent infringement suit.  Although this court does not consider each statement in isolation but

rather considers "the cumulative effects of the [defendant's] actions," Ion Beam Applications,

S.A. v. Titan Corp., 156 F. Supp.2d 552, 555 (E.D. Va. 2000), the court considers such

cumulative effect in conjunction with the Federal Circuit's instruction that this court's ruling

should turn on the substance of the parties' relationship.  EMC Corp., 89 F.3d 807 at 811-12.

This relationship is clarified when the excerpts of the letter that plaintiffs rely upon as threats to

sue are considered in context.

Looking first to the statement that Canady Technology's proposed probe sales would

violate the McGreevy patent, the intended purpose of the paragraph that mentioned the

McGreevy patent was to list all of plaintiffs' activities which made ConMed question whether its

efforts to "negotiat[e] in good faith to reach a resolution" were being "met with a reciprocal

undertaking."  Jonas Decl. Exhibit N at 1.  The bulk of this paragraph plainly alleges that

plaintiffs' actions were in violation of the Canady-ConMed Contract and that such actions were

inconsistent with good faith negotiations.[14]  The context of the paragraph does not expressly nor

impliedly evince an intent to file a suit pursuant to the McGreevy patent.

Looking next to the statement where ConMed asserted its plans to "pursue all remedies

available to it," the context of this statement again shows that the relationship of the parties was

still one of negotiation over a disagreement which primarily related to a Contract dispute, not a

potential patent infringement action.  The conclusion of the May 27, 2005 letter written by Mr.

---

[14]  After listing a number of plaintiffs' actions that ConMed found objectionable,
consistent with the overall tone conveying ConMed's disappointment with plaintiffs'
commitment to negotiation, the paragraph concludes:

> We are somewhat concerned that, as you have told us and as it appears from the
> Pittsburgh Post Standard, you may have secured government financing for the creation
> of a company whose described purpose seems to be to manufacture and sell the very
> product for which Conmed has an exclusive license.  We are particularly concerned
> about these apparent developments, as you must have been working to consummate
> these arrangements when you should have been discussing any dissatisfaction you may
> have had with ConMed's performance under the License with us.

Jonas Decl. Exhibit N at 2.

Corasanti states as follows:

> I have enclosed a draft term sheet more closely reflecting what we believe is still a
> remarkably one-sided agreement, but one we can live with.  We cannot live with
> less.  We have done more than our fair share to make concessions to meet in the
> middle ground.  Unless there is agreement on the points above, or at least
> significant movement in this direction, <u>Conmed will have no choice but to proceed
> with the arbitration and to pursue all remedies available to it</u>.[15]  From where I sit,
> without concessions from the Canady side– and to date, there have been none, not
> one– Conmed has nothing to lose by proceeding to arbitration, as Conmed gains
> virtually nothing from the deal now being offered in the Canady Term Sheet."

Jonas Decl. Exhibit N at 4 (emphasis added).  Not only does this statement not threaten suit, its

purpose appears to be the opposite as it attempts to persuade the plaintiffs to reach an amicable

solution.

Furthermore, focusing on the parties relationship, all the statements relied upon by

plaintiffs were made in the context of negotiations attempting to solve the parties' disagreement.

It is "well-settled that positions adopted by a declaratory judgment defendant during on-going

licensing negotiations cannot be used to support plaintiff's objective, reasonable apprehension."

CAE Screenplates, 957 F. Supp. at 790.  Plaintiffs admit that during the May 11, 2005

negotiations, it was plaintiffs who announced to ConMed that Dr. Canady had provided Canady

Technology a license to sell single and dual-mode probes under his patent. Pl. Opp. p.8.  During

this meeting, Dr. Canady even showed ConMed a copy of a draft brochure that Canady

---

[15] The letter specifically mentions four remedies that ConMed might pursue if it chose to
enforce the Canady/Conmed License agreement.  None of these remedies expressly or impliedly
mention a patent infringement suit.  Although one of the remedies mentioned is the filing of a
lawsuit, the letter expressly states that such suit would be for money damages resulting from
plaintiffs' "breach of contract" that would occur if plaintiffs sold "dual mode probes in the USA
and other countries." Jonas Decl. Exhibit N at 5.  Additionally, following the four remedies listed
in the letter is a paragraph which states: "We prefer to resolve these issues through fair
negotiation." Id.

Technology planned to use to sell its single and dual-mode probes, a display that likely put

ConMed on the defensive.  Id.  Responding to such statements, ConMed announced that sale of

such probes would violate the Canady-ConMed contract as well as the McGreevy patent.[16]

Likewise, in the letter mailed two weeks later, the first sentence indicated that the letter was

written "in response to the Canady Term Sheet . . . circulated last week."  Jonas Decl. Exhibit N

at 1.  The letter made it clear that the parties were in the midst of negotiations and ConMed,

disappointed with Canady's proposed terms, believed "it [would] be useful to outline a few

points" in order to help plaintiffs "appreciate [ConMed's] perspective."  Id.  Thus, ConMed's

statements that plaintiffs rely upon to create apprehension were made in a scenario almost

identical to the situation in Shell Oil.  ConMed, who merely responded to Canady's proposals

during the course of negotiations, made no "threats" sufficient to create an objectively reasonable

apprehension of imminent litigation.

### B.  Element Two: Produced or made "significant preparations" to produce the allegedly infringing product and Plaintiffs' Leave to Amend[17]

Plaintiffs' proposed updates to their complaint seek to rebut defendant's charges that

plaintiffs had not, at the time of filing their complaint, made "significant preparations" to

produce the allegedly infringing probes.  Although leave to amend or supplement a complaint

---

[16] Plaintiff's Memorandum in Opposition to ConMed's Motion to Dismiss states: "After hearing Dr. Canady's plans and the product descriptions, Corasanti and Jonas told the group, including [Canday's supplier & investor], that the probes Canady Technology intended to sell would violate ConMed's Exclusive License Agreement and its McGreevy Patent." Pl. Opp. p. 9 (emphasis added).

[17] This section of the opinion will also address plaintiffs' leave to file an amended complaint because the proposed supplements and amendments pertained to whether or not plaintiffs had alleged significant preparations to produce the allegedly infringing probes.

should generally be granted, in declaratory judgment patent cases, jurisdictional defects cannot be

corrected through a supplemented complaint.  West Interactive Corp. v. First Data Resources,

Inc., 972 F.2d 1295, 1297 (Fed. Cir.1992) (finding that "because this court examines [plaintiff's]

declaratory judgment action at the time of its filing, [defendant's] subsequent action is

irrelevant"); Spectronics Corp. v. H.B. Fuller, Co., 940 F.2d 631, 634-35 (Fed. Cir. 1991) ("We

agree wholeheartedly that in personam and subject matter jurisdictional facts must be pleaded,

and proved when challenged, and that later events may not create jurisdiction where none existed

at the time of filing."); Arrowhead, 846 F.2d at 734 n.2 ("The presence or absence of jurisdiction

must be determined on the facts existing at the time the complaint under consideration was

filed.").

 Here, the plaintiffs at least alleged in their original complaint that they made significant

preparations to produce the potentially infringing probes.[18]  If such allegations were deemed to be

---

[18] Although the court does not offer an opinion on the second element of the test outlined
in Goodyear and Arrowhead because the first issue is dispositive, plaintiffs may have been able
to satisfy the second element.  For example, in the original complaint the plaintiffs state:

 Canady Technology has entered into a contract with KLS Martin GmbH, a German
 company to manufacture the single and dual mode probes for Canady Technology to
 sell and distribute.  Canady Technology has paid $230,000 to KLS under the
 contract, and KLS has commenced manufacturing of the probes.  Canady
 Technology is ready to take delivery.  Canady Technology has expended substantial
 additional sums to lease office space for its sales and distribution staff, equipment
 and furniture, and to prepare marketing materials to sell the probes.

Compl. ¶¶ 27-28 (emphasis added).

 Defendant, however, argues that plaintiffs' failure to seek FDA approval for the sale of
probes in the United States before filing their complaint shows lack of significant preparations.
Additionally, defendant claims that plaintiffs' actions quoted above are consistent with probe
sales that already occur outside the United States and these sales do not violate the McGreevy
patent.  Therefore, defendant claims that plaintiffs have not adequately established that they made
significant preparations for probe sales inside the United States.  The court does not seek to
resolve such disputes as plaintiffs' lack of an objectively reasonable apprehension of litigation
prevents plaintiffs from proceeding in this court.

true, they would support granting the plaintiffs' leave to amend because as long as the first complaint was jurisdictionally sound, there appears to be little reason to decline such request. However, this court declines to offer a finding on this matter as the plaintiffs' failure to establish "reasonable apprehension," discussed in the previous section of this opinion, requires dismissal of Count II of plaintiffs' complaint. Therefore, the plaintiffs' leave to amend their complaint is deemed moot and this court offers no opinion on the merits of such request.

### C. The court's discretion to decline to exercise discretionary jurisdiction

In the alternative, even if this court found that plaintiffs had met the burden of establishing the two jurisdictional requirements, the court would decline to exercise jurisdiction with respect to Count II of plaintiffs' complaint. Elecs. for Imaging, Inc. v. Coyle, 394 F.3d 1341, 1345 (Fed. Cir. 2005) ("The district court is not required to exercise declaratory judgment jurisdiction, but has 'unique and substantial discretion' to decline that jurisdiction.") (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)). The court's discretion, however, is not plenary and the court must have "well-founded reasons" for declining to exercise jurisdiction. Capo, Inc. v. Dioptics Med. Prods., 387 F.3d 1352, 1355 (Fed. Cir. 2004). A court has a well-founded reason if declaratory judgment jurisdiction "would not afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." BP Chemicals Ltd. v. Union Carbide Corp., 4 F.3d 975, 981 (Fed. Cir. 1993). When determining whether to exercise jurisdiction the court must consider the goals of the Declaratory Judgment Act including "promoting resolution of disputes." Elecs. for Imaging, 394 F.3d at 1346. When considering the Act's goals, the Federal Circuit has held that "a court may take into account the pendency of serious negotiations to sell or license a patent." EMC Corp., 89 F.3d at 814.

Turning to the facts, when the complaint was filed, the parties were in the midst of

negotiations.[19]  Although the McGreevy patent was mentioned during these negotiations, the bulk

of the dispute was focused on the Canady-ConMed Contract.  Even if the court accepts plaintiffs'

claim that ConMed's statements made during negotiations created an objectively reasonable

anticipation of a patent infringement suit, the court must weigh this fact against the goals of the

Declaratory Judgment Act, including the purpose of "promoting resolution of disputes," as well

as the consideration of whether exercising jurisdiction would afford the plaintiffs "relief from the

uncertainty, insecurity, and controversy giving rise to the proceeding."

Here, the underlying controversy "giving rise to the proceeding" is the dispute over the

Canady-ConMed Contract.  The bulk of the dispute relates to this matter because the Contract

provided ConMed an <u>exclusive</u> license for dual-mode probes and required ConMed to make

royalty payments to plaintiffs when such sales occurred.  Contrarily, the Contract only granted

ConMed a <u>non-exclusive</u> license for single-mode probes and, even more notably, provided for no

additional income stream to plaintiffs based on ConMed's sales of single-mode probes.  Because

this court does not have jurisdiction to consider the rights of the parties under the Contract or

even if the contract is still enforceable, making a determination on the McGreevy patent would

not end the plaintiffs' "uncertainty, insecurity, and controversy giving rise to the proceeding."

Additionally, in light of the fact that all of ConMed's alleged threats were made in the

midst of negotiations, the fact that all alleged threats were merely responses, characterizations,

and arguments made in defense to plaintiffs' proposed actions, the fact that negotiations were

---

[19]  The five page letter written by Mr. Corasanti on May 27, 2005, and quoted extensively
above, was dated less than a week prior to the date plaintiffs' complaint was filed.

ongoing when the plaintiffs filed their complaint, and the fact that arbitration has the potential to

end the plaintiffs' uncertainty as well as the entire controversy, the court would decline to

exercise discretionary jurisdiction.[20]  Similar to the situation in <u>EMC Corp</u>, here, the parties were

in negotiations up to the point when the complaint was filed.  89 F.3d at 814-15.  The Federal

Circuit has instructed that in such circumstances: "While a court may conclude that ongoing

negotiations do not negate the presence of a controversy for jurisdictional purposes, the court

may nonetheless find, in deciding whether to hear the declaratory judgment action, that the need

for judicial relief is not as compelling as in cases in which there is no real prospect of a

non-judicial resolution of the dispute."  <u>EMC Corp.</u>, 89 F.3d at 814-15.

As a result of the factors discussed above, even if this court concluded that the

defendant's statements and the plaintiffs' actions were sufficient to establish the jurisdictional

prerequisites, this court, in its discretion, would decline to exercise declaratory judgment

jurisdiction.

## V. Conclusion

For the reasons discussed above, the court **GRANTS** the defendant's Motion to Dismiss

───────────────

[20] As discussed in note 9, an arbitration resolution in ConMed's favor would not necessarily render the McGreevy patent dispute moot.  Likewise, an arbitration award in Canady's favor would not render the dispute moot.  However, the discretion that this court is charged with is not merely to determine if such a claim will be rendered legally moot.  Rather, it is this court's role to consider whether exercising jurisdiction would further the goals of the Declaratory Judgment Act.  In doing so, the court should consider the pendency of negotiations. Here, if the parties reach an agreement as a result of further negotiations the dispute over the McGreevy patent will likely come to an end.  Likewise, if through arbitration the Canady-ConMed contract is deemed to be enforceable and the parties reaffirm their business relationship, the McGreevy controversy would likely end.  Furthermore, the limited life of the McGreevy patent makes an agreement rather than litigation over the McGreevy patent far more attractive and therefore, more likely. Considering all of these factors, <u>discretionary</u> jurisdiction should not be exercised at this time.

plaintiffs' declaratory judgment action as to both Count I and Count II.  Because the court finds

that the dispute regarding Count I falls within the scope of the arbitration clause contained in the

Canady-ConMed Contract, the court **DENIES** the plaintiffs' Motion to Enjoin Arbitration.

Furthermore, the plaintiffs' Motion for Leave to File an Amended and Supplemented Complaint

is deemed **MOOT**; therefore, this court declines to rule on the merits of such request.

The Clerk is **REQUESTED** to send a copy of this Order to counsel for all parties.

**IT IS SO ORDERED.**

                                          /s /
                                         Jerome B. Friedman
                               UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
November  8 , 2005